PEOPLE *v.* UBBES.

1. CRIMINAL LAW—CONFESSION—EQUALLY DIVIDED COURT.

Conviction for larceny is ordered remanded for determination by trial judge on separate record heretofore made as to voluntariness of confession and grant of new trial in case it be found involuntary per DETHMERS, KELLY, BLACK, and O'HARA, JJ.; and for new trial because confession was obtained by police during a period of detention, made unlawful because accused was not promptly presented before a magistrate, and the delay was manifestly for the purpose of obtaining a confession before he was advised of his rights by a judicial officer, per KAVANAGH, C. J., and SOURIS, SMITH, and ADAMS, JJ.

2. SAME—SEARCH AND SEIZURE—EVIDENCE—ARC WELDER.

Arc welder was properly admitted in evidence in prosecution for larceny, where it had been discovered by State trooper after he climbed fence into defendant's property to retrieve hunting dog, ascertained welder had been reported stolen, and defendant voluntarily accompanied officers to where welder had been found, since it had not been obtained by unlawful search and seizure.

Appeal from Kalamazoo; Sweet (Lucien F.), J. Submitted May 7, 1964. (Calendar No. 75, Docket No. 50,295.)   Decided February 2, 1965.

Frank Ubbes was convicted of larceny. Jurisdiction released and cause remanded for consideration of separate record and determination of whether confession was voluntary, with grant of new trial or affirmance of verdict of guilt dependent thereon, per DETHMERS, KELLY, BLACK, and O'HARA, JJ., and for new trial per KAVANAGH, C. J., SOURIS, SMITH, and ADAMS, JJ.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *John L. Schwendener,* Prosecuting Attorney, for the people.

*Hoffman, McDonald & Hoffman,* for defendant.

REFERENCES FOR POINTS IN HEADNOTES
[1]  20 Am Jur, Evidence §§ 499, 532 *et seq.*
[2]  47 Am Jur, Searches and Seizures § 17.

O'Hara, J. (*for remand*).  Frank Ubbes was arrested for, charged with, and convicted of larceny over $100, under somewhat unusual circumstances. Since the conviction took place on September 18, 1961, the defendant had no appeal therefrom as a matter of right.  Upon application for leave to appeal, it was granted, but limited to 3 questions raised in the application:

(1) Was defendant's confession obtained while defendant was held in custody without being taken before a magistrate admissible?

(2) Was defendant's confession involuntary as a matter of fact?

(3) Was there an illegal search and seizure?

The circumstances of his arrest, confinement, and arraignment are as follows:  In the afternoon of October 26, 1960, Jack White, a State police officer, while off duty was hunting pheasant in St. Joseph county.  At the conclusion of the hunt his bird dog took unauthorized leave and went off upon land adjoining that on which his master had been hunting.  The trooper climbed over a fence separating the 2 parcels.  At a point about a quarter of a mile from the home of defendant, upon whose land the officer had entered, "at the tip of a marsh," Officer White retrieved his Brittany spaniel.  The spaniel flushed a pheasant, and near this point the trooper observed a 4-wheel machine of some sort partially concealed by a tarpaulin and a piece of plywood. With understandable curiosity he pulled back the tarpaulin.  The machine was revealed to be an arc welder not indigenous to the growth and cover of that area which he described as "pine seedlings."  He made a record of the serial number thereof and carried his errant spaniel back to his car.  Upon checking out the serial number the arc welder was shown as reported stolen.  Thereafter, at about 6 p.m. he

changed to his uniform, got a wrecker and drove back to defendant's farm. He knocked at Mr. Ubbes' door and inquired whether he, Ubbes, had an arc welder on his property. The reply was negative. The officer then informed defendant that there was one on his land and that it had been reported stolen. The officer then said, according to his testimony: "Would you care to go down and take a look at it?" He testified that Ubbes replied "All right." This, Ubbes later denied. The State trooper who had been joined by the chief of police, together with defendant, went back to the point where the welder was hidden. Some further conversation as to how the machine came to be there took place. The State policeman then placed defendant "temporarily" under arrest for possessing stolen property. We are moved to comment for the guidance of law enforcement officials that we do not apprehend what constitutes a "temporary" arrest. An arrest is an arrest. It contemplates apprehension and detention. In the broad sense, all arrests are of course "temporary" pending further legal disposition of the issue of detention. We merely caution that no less a legal basis exists for a "temporary" arrest than an officer's arrest in its generally accepted sense.

The officers having taken defendant into custody, drove to the village of Schoolcraft to the police chief's office attached to his residence. Thereupon the trooper and the sheriff began to question him. The questioning had been in progress about 10 minutes when Trooper White was advised by telephone that his assigned partner, Trooper Panosso, was looking for him. White left defendant in the police chief's custody and went by car to locate his partner. He found him in some 20 minutes and returned to the police office. The 3 officers then took defendant to the State police post at White

Pigeon. En route they were delayed for a brief period to answer a radio call. They arrived at the State police post about 9:40 p.m., some 3 hours and 10 minutes after defendant's arrest. Defendant was then photographed, fingerprinted and questioned further. This procedure took an hour or so. At 10:45 they took defendant to the Centreville jail where he was booked and lodged in a cell at 11 p.m. He was not questioned further that night. It should be noted that in the interim between 6 p.m. and 11 p.m. the officers by the demands of location of jail facilities, the police chief's office, and the State police post, had driven some 55 to 60 miles. They had during the period fingerprinted and photographed defendant, "booked" him and placed him in a cell. Meanwhile, they had answered a radio call and encountered a brief delay while the arresting officer located his officer-partner. After defendant had been confined in the jail, the State police considered it advisable to assign a detective to the case. The officer chosen was a Detective Muth, who was a specially trained interrogator. He came to the jail at about a quarter of five in the morning. He awakened defendant and questioned him vigorously, applying special techniques, some of which, if accurately described by defendant, offend against defendant's constitutional guaranties. They consisted of requiring defendant to sit with his knees locked inside those of the questioning officer while he forced defendant physically to keep is head in a fixed position and his eyes and attention on the inquisitor. After the foregoing questioning, according to the officers, defendant who had up to then, steadfastly maintained his innocence, indicated that if he could talk with his wife he might change his story. The detective and the other officers went to Ubbes' home where

they allege Mrs. Ubbes asked them to wait until her children left on the school bus. While waiting, the officers—and this issue is controverted—with or without permission, searched the premises and found other incriminating evidence of theft, in the nature of tools and equipment. When Mrs. Ubbes arrived at the jail at about 10:30 a.m. on the 27th, the morning following his arrest, it is claimed she said to her husband, "Frank, they found everything." Thereafter, with his wife present, defendant signed a statement admitting the theft of the arc welder.

Diligent defense counsel, both after the preliminary examination and in advance of trial, by proper motion, raised all the obvious constitutional issues: illegal search and seizure, illegal arrest, and illegal confinement, and by motion sought to suppress the admission of the arc welder and defendant's alleged confession.

The trial judge ordered a special record made in the absence of the jury, at which both the officers and defendant and his wife gave their separate versions of the factual antecedents of the defendant confessing. On the basis of that record, he held that issues of fact were involved and submitted the question of the voluntariness of the confession to the jury, and denied the motion to suppress the admission of the arc welder in evidence. As before noted, the jury convicted.

While we granted a limited review of this case on application for leave to appeal, the advent of the decision of the United States Supreme Court in *Jackson* v. *Denno,* 378 US 368 (84 S Ct 1774, 12 L ed 2d 908) mandates our expansion of the scope of review. Under the rule we adopted after *Jackson, supra,* (see our decision on rehearing in *People* v. *Walker,* 374 Mich 331), we perforce must

remand here, at least for a separate determination of the issue of voluntariness. We will include rulings on issues which would be likely to arise in the event of a new trial.

As to the first assignment of error, we hold:

(1) Defendant's detention and confinement in jail from 6 p.m., October 26th to 10:35 a.m., October 27th, at which time he made a statement admitting his guilt of theft, did not, under the circumstances here shown, render the statement, *i.e.*, confession, inadmissible as a matter of law, as being obtained during illegal custody for failure to take him before a magistrate within that period.

The lapse of 16-1/2 hours *per se* is not conclusive. Time of detention alone, without arraignment, is not the test. If for the same 16-1/2 hours defendant had been held without appearance before a magistrate and he had been "sweated," *i.e.*, questioned unremittingly for the purpose of extracting a confession, we would not hesitate to strike down the practice and withhold from jury consideration his alleged confession. Here the totality of circumstance indicates bona fide questioning to determine the immediate issue of release, or complaint, and complaint for what offense. We believe this is the meaning of the rule announced in *People* v. *Hamilton,* 359 Mich 410. In *Hamilton's* concluding page, Mr. Justice Black summed up the circumstance, at p 419, the composite of which rendered that defendant's confession inadmissible:

"A feeling of 'strong distaste' generates from the protracted detention in violation of law of this youthful—and ill if not terrified—subject of another country; one whose comprehension of English words and of American processes of justice—including the consequences of such processes—must have been substantially nil, much as if he were shown as being

of low or uneducated mentality; meanwhile denying access of counsel to him, all for the record-evident purpose of extracting a confession of guilt of murder in the first degree."

Police officers, it must be understood, operate in a world of reality not under ideally conceived circumstances in which, when arrest is made, all interest in the total area of the officers' responsibility immediately focusses undeviatingly upon the status of the particular apprehended and detained person. The officers here, working in a sparsely populated area, had to travel back and forth between several small communities to effect the totality of arrest and confinement. Mere lapse of time, without arraignment, *can* render a confession obtained during such detention illegally obtained and hence inadmissible as a matter of law. We do not find the situation here to require the application of the "lapse of time only" rule.

As to granted review of question No 2, whether defendant's confession was inadmissible as a matter of fact, we hold the question is now controlled and determination thereof is to be made consonant with the "orthodox" rule of admissibility. See *People* v. *Walker,* on rehearing, 374 Mich 331.

We direct the able trial judge to consider the separate record he wisely ordered to be made herein on the issue of the voluntariness of the confession. If he concludes, under that record, the confession of defendant Ubbes was involuntarily given, he will thereupon order a new trial. If he determines, on careful review of that record, that the confession was admissible, we will consider here, as in *Walker, supra,* that defendant has had his trial conducted in accordance with due process as mandated in *Jackson, supra.*

As to question No 3 the alleged illegal search and seizure and the consequent suppression of the arc welder from admission in evidence we hold: The action of Trooper White in committing at best a technical trespass in climbing the fence to retrieve his dog in nowise rendered what he observed there, a quarter of a mile from the curtilage, the fruit of an illegal search. Certainly officers, because they are officers, are not required to act the part of blinded bats, disregarding what plainly is to be seen and suppressing every instinct of natural human curiosity. This was no invasion of defendant's constitutional guaranty against an illegal search. If the officer's hat blew off over a fence in an open field, and in retrieving it he came upon a dead body, is he supposed then to be foreclosed from seeking to identify it? Nor did he exceed his authority in asking defendant if he had known it was there when it was shown to him. Absent any rational explanation, he had probable cause to believe a felony had been committed and probable cause to believe defendant committed it. His arrest of defendant without a warrant was justified. We think the trial court correctly disposed of the motion to suppress.

In the event a new trial is ordered, we suggest to the trial judge that he consider with attention the following language in his charge to the jury:

"While it is often necessary and entirely proper for law-enforcing officers to interrogate persons suspected of the commission of a crime, or suspected of having some knowledge in regard thereto, and without which questioning many crimes would not be solved, and the public could not be properly protected, *the rights of the individual must at all times be considered, and any invasion of those rights must be reasonable and held to the barest minimum.*" (Emphasis supplied.)

We do not here say, lifted as it is from the balance of the charge, the language *"any invasion of those rights must be reasonable and held to the barest minimum"* is reversible error but it is perilously close thereto. Constitutional rights, and those are the rights referred to here, are absolute. They are not comparative. They are not to be equated with reasonableness or with minima and maxima. A violation is a violation. Judicial condonation of a violation thereof is not even to be suggested.

Here, as in *Walker, supra,* we release jurisdiction and remand for the further proceedings here and therein outlined.

DETHMERS and KELLY, JJ., concurred with O'HARA, J.

BLACK, J., concurred in result.

SOURIS, J. (*for reversal and remand*). Defendant Frank Ubbes was a steamfitter by trade and lived with his wife and three children in St. Joseph county on an 80-acre farm he owned free and clear. In the words of the trial judge, at sentencing, "We have here a mature man, who up to the time of his arrest for this offense had almost[1] a spotless record. * * * During his lifetime he has worked well and hard at his trade. He has always been industrious; he has been thrifty; he has been a good provider; he is a family man. * * * He comes from a good family; he was raised in a good family." Upon conviction, here reviewed, he was sentenced to serve 15 months to five years' imprisonment.

In the early evening of October 26, 1960, some time after 6 p.m., Mr. Ubbes was repairing the blower on the furnace in the basement of his farm

---

[1] He had been arrested and convicted in 1944 on a "drunk charge."

home when a uniformed State police officer and the local police chief appeared there and advised him there was an arc welder on his property that had been reported stolen. The events which transpired thereafter in this case, as disclosed by the testimony of the people's own witnesses, merit careful examination and detailed recitation by this Court, not alone for their pertinence to our decision in this defendant's appeal but, as well, for their pertinence in assaying the quality of the liberty and security each of us is guaranteed by our Constitutions, State and Federal.

State Trooper White testified that at about 2 p.m. in the afternoon of the day Mr. Ubbes was arrested, he was hunting on property adjoining the Ubbes farm. His dog somehow got onto the Ubbes property and, according to the trooper, solely for the purpose of retrieving his dog, he climbed over a wire mesh fence four feet high and entered upon the Ubbes property. When 600 feet beyond the fence, he observed a wheeled object partially covered by plastic and tarpaulin, which he uncovered sufficiently to identify as an arc welder. Without explanation for his action, Trooper White testified that he made a record of the welder's serial number, retrieved his dog and climbed over the fence again onto the property on which he had been hunting. Thereupon he proceeded to his home, determined by telephone that the welder had been stolen (it had been taken from a construction site six months earlier), changed into his uniform and drove to defendant's home some time after 6 p.m., picking up the local police chief en route and arranging for a truck to accompany them.

Upon arrival at defendant's farm home, Trooper White advised him that there was a stolen welder on his property and, upon defendant's assertion that

he knew nothing about it and with defendant's permission, drove defendant to its site. Upon the trooper's order and with the defendant's consent, the welder was attached to the truck which accompanied the two officers and it was hauled away to be used later during defendant's trial as evidence against him. Defendant was thereupon advised he was "temporarily under arrest for possession of stolen property" and was driven by the officers to the police chief's office in Schoolcraft.

In the meantime, defendant's questioning had begun. The officers had questioned defendant at his home, as they were driving to the site of the welder on defendant's property, while examining the welder, and while en route to Schoolcraft. When they reached Schoolcraft defendant was questioned further for 35 to 40 minutes. Then Trooper White was notified by telephone that his partner, Trooper Panosso, was looking for him, whereupon he left the police chief's office and returned shortly thereafter with his partner. Defendant was again questioned briefly and then placed in a police car for transport to the State police post at White Pigeon, where they arrived at about 9:40 p. m. While traveling to the post, the questioning continued, even when the officers stopped so that Trooper Panosso could investigate a complaint, Trooper White remaining in the police car with defendant. Trooper White had requested by radio that Detective Muth be summoned to White Pigeon to assist in the interrogation of the defendant.

The two troopers and Detective Muth questioned the defendant from 10 p. m. to approximately 10:45 p.m. and, upon defendant's continuing denial of any knowledge concerning the welder's presence on his property, he was taken to the jail in Centerville and left there at 11:10 p.m. The troopers and

Detective Muth then returned to Mr. Ubbes' residence where they were joined by the State police district detective, Sergeant Lutz. The Ubbes children apparently were by then asleep, but Mrs. Ubbes was not. She was questioned in the middle of the night by the officers who were joined by other police officers and, assertedly with her permission, a search of the premises was made. At 4:30 in the morning, Detective Sergeant Lutz, Detective Muth, and the two troopers returned to Centerville where Lutz, a specially trained interrogator, and Muth questioned defendant.

Detective Sergeant Lutz candidly testified that the purpose of his interrogation of Mr. Ubbes was to get a confession from him. He described his questioning technique in some detail. His description of it is set forth in the margin.[2]

---

[2] "Q. Where did you sit in relation to where Mr. Ubbes sat?
"A. At what time?

"Q. Well, I don't want to split hairs.
"A. I sat in two different places * * *

"Q. Close to him or far away.
"A. At that time I assume it would be probably six feet.

"Q. Close enough so you could have reached out and touched him if you wanted to?
"A. Not at six feet.

"Q. Where was the second position?
"A. It would have been immediately in front of him. Probably within a foot from him.

"Q. He was sitting on a chair?
"A. Yes, sir.

"Q. You were sitting on a chair?
"A. Yes, sir.

"Q. Were you straddling him with your legs?
"A. Yes, sir.

"Q. I mean by this, did you have your legs spread and his legs in between yours?
"A. Yes.

Mr. Ubbes did not confess while being subjected to the Lutz technique, but immediately thereafter,

---

"*Q.* What was the purpose of that position in the interview?

"*A.* That is a technique that we subscribe to—

"*Q.* Supposing the interviewee looks away from you. Do you do anything to make him look back at you?

"*A.* It is our aim and objective to keep his attentions to ourselves, yes.

"*Q.* Did Mr. Ubbes look away?

"*A.* I would think he did.

"*Q.* How did you get his attention back when he did?

"*A.* I probably talked to him.

"*Q.* Did he ever look away and you reach up and move his face back so it would look at you—not hurting him—

"*A.* I possibly did, yes.

"*Q.* How many times did you do that?

"*A.* I can't recall.

"*Q.* Is that something you usually do?

"*A.* It is a standard technique we use, yes, sir.

"*Q.* You have been a State trooper, State police officer, how many years?

"*A.* In May, 21.

"*Q.* Are you the principal interrogator for the fifth district?

"*A.* I have been called upon to teach and instruct in interrogation, yes.

"*Q.* Is this your principal area of police work?

"*A.* No, sir.

"*Q.* Is it an important area of your police work?

"*A.* Yes, very important.

"*Q.* I mean you individually.

"*A.* Yes, individually.

"*Q.* And you actually teach a course in this?

"*A.* Yes, I do.

"*Q.* During that period of time when you were straddling him and when you may have moved his face back into position, how long did you sit in that position and he in his?

"*A.* I couldn't say. It might have been 10 minutes. Don't think it would have been over 20. I just couldn't say. * * *

Detective Muth, thinking that "possibly a change of personalities could assist in this interrogation", had

"*Q.* What kind of conversation did you have with Mr. Ubbes about his wife then? How did his wife come into this?

"*A.* There are various areas in which you attempt to reach an individual, if I can use that word, so that it is understood; different techniques and areas in which you attempt to get to an individual, to attempt to make them ascertain the truth in a situation is probably the best.

"It is the skill of the interrogator, of the person doing the interview, to attempt to fit the particular individual into the area in which you are trying to talk about. Frankly, I probably wasn't proceeding as I thought I should at different areas. That would be the reason I talked to Mr. Ubbes about his wife and family.

"*Q.* 'And family', did you say?

"*A.* Yes.

"*Q.* You never took a course in hypnotism, did you, Sergeant Lutz?

"*A.* No, sir.

"*Q.* Did you ever tell him during this conversation it would be much easier on him if he would make a statement or say something relating to the arc welder?

"*A.* Would you be referring to the area of a promise?

"*Q.* No, did you say something like in this general term: 'It will go easier on you, it will be easier for you, it will be easier for your wife and family if you tell us the whole story about the arc welder.'

"*A.* No, I don't think I did go to that extreme. You are on the area of promising, and, of course, we can't promise. I have often referred to any person I am talking to, 'If you tell the truth, truth will prevail, and in the long run it will be best.'

"*Q.* And your wife and family will be better off?

"*A.* I didn't say that.

"*Q.* You said 'wife and family' a minute ago. How did you say that?

"*A.* I probably could illustrate. I don't recall the exact conversation. It would have been along an area we do use and that I would use, and it would be along the area of, probably, 'For their welfare and their benefit, if something is wrong, isn't right, you probably better get right.'

"*Q.* Did you ever mention our court system and what happens to him in court or out of court during this interrogation?

"*A.* On the contrary, I didn't.

"*Q.* The word 'court' never came into your conversation?

"*A.* I couldn't say that. It might have. But in the area of saying the court would do this or that, no.

"*Q.* And you never indicated it would be harder on him if he did not make a statement of some sort about the arc welder?

"*A.* No, sir."

Mr. Ubbes brought to him and, after brief interrogation by Detective Muth, defendant requested that his wife be advised he would like to see her "and then I might tell you the entire story." Three of the officers returned to the Ubbes farm shortly after 7 a.m., informed defendant's wife of his request and also advised her that they had a good case against her husband. After waiting for Mrs. Ubbes to send two of her children off to school by bus, the officers together with Mrs. Ubbes and a third child, who was ill, returned to Centerville at about 10:20 a.m. Husband and wife, both in tears and the sick child clutching Mr. Ubbes' leg, embraced upon meeting and Mrs. Ubbes assertedly said, "Frank, they found everything." Within 10 minutes thereafter, the officers testified that Mr. Ubbes agreed to give them a statement in writing. The written statement, a part of which was admitted in evidence, consisted of three typewritten pages, signed by the defendant. It was completed, so we are told, at 12:15 p.m. of the day following defendant's arrest. Nowhere in the record before us, does it appear when thereafter defendant first was produced before a magistrate in compliance with the statutory requirement set forth, *infra,* in footnote 5.

Those are the facts of the case from the mouths of the prosecution's own witnesses. Defendant and his wife testified somewhat differently about some of the events described above.[3] We need not con-

---

[3] Defendant's wife testified to intermittent nocturnal questioning by officers who entered her farm home uninvited, to the officers' refusal to permit her to obtain counsel for her husband, and to the officers' conditioning her meeting with her husband upon her agreement to urge him to plead guilty.

Defendant testified to physical and psychological maltreatment by certain officers, to his objections to search and seizure without a warrant, and to denial of his repeated requests to consult with an attorney prior to his alleged confession. He denied that he made the confession, alleging that, instead, it was dictated by Detective Muth to Trooper White and that he signed it only when the officers

sider their testimonial versions of the defendant's arrest, detention, questioning, and confession and of the officers' nighttime search of defendant's home and questioning of defendant's wife, however, for the prosecution's own witnesses' testimony compels our conclusion that the trial court erred reversibly in admitting into evidence defendant's confession. What we have here is a nighttime arrest in his own home of a theretofore respectable member of a rural community, without an arrest warrant, for possession of a stolen chattel. Having arrested defendant, presumably believing they had probable cause sufficient to support their action, the police officers did not promptly take defendant before a magistrate as required by law[4] to do but, instead, they subjected him to a course of interrogation, without the benefit of counsel or even so much as any advice about his constitutional right to remain silent, from the time of his arrest early one evening until the following afternoon, with only a scant period of respite in the night, for the admitted purpose of getting a confession from him. The confession thus obtained should not have been admitted in evidence against defendant.

### I.

Almost five years ago, in *People* v. *Hamilton*, 359 Mich 410, we held unanimously that a confession obtained during a period of illegal detention of a prisoner for the purpose of interrogation was inadmissible in evidence. The basis of our decision was that, in order to discourage illegal detention of prisoners for interrogatory purposes by police authorities sworn to uphold the law, admissions and confessions however obtained during such periods

---

threatened to imprison his wife, who was in the next room, if he did not sign.

[4] Quoted, *infra*, footnote 5.

of illegal detention must be excluded from evidence in courts of law.   That such was the rationale of our *Hamilton* decision was emphasized by our subsequent, and again unanimous, decision in *People* v. *McCager,* 367 Mich 116, where we said, at pages 118, 119:

"Two years ago, in *People* v. *Hamilton, supra,* at p 417, this Court unanimously held that 'an unnecessary and so unlawful delay of compliance with either of said sections 13 and 26,[5] when done for prolonged interrogatory purposes and without proven justification of the delay, renders involuntary and so inadmissible whatever confessional admissions the detained person may have made while so unlawfully detained.'

"Thus Michigan became the first State to adopt the exclusionary principle announced in *McNabb* v. *United States,* 318 US 332 (63 S Ct 608, 87 L ed 819), which the Federal courts are required to follow.   See *Culombe* v. *Connecticut,* 367 US 568, 600 (81 S Ct 1860, 1878, 6 L ed 2d 1037, 1056), footnote 53 of Mr. Justice Frankfurter's opinion; 7 Wayne L Rev 51, 60; and *People* v. *Lundberg,* 364 Mich 596, 604.

---

[5] The pertinent statutory provisions interpreted in *Hamilton* and applicable in this case of Ubbes read:

"A peace officer who has arrested a person without a warrant must without unnecessary delay, take the person arrested before the most convenient magistrate of the county in which the offense was committed, and must make before the magistrate a complaint, stating the offense for which the person was arrested." Section 13, chapter 4, code of criminal procedure (CL 1948, § 764.13 [Stat Ann 1954 Rev § 28.872]).

"Every person charged with a felony shall, without unnecessary delay after his arrest, be taken before a magistrate or other judicial officer and, after being informed as to his rights, shall be given an opportunity publicly to make any statement and answer any questions regarding the charge that he may desire to answer." Section 26, chapter 4, code of criminal procedure (CL 1948, § 764.26 [Stat Ann 1954 Rev § 28.885]).

Section 13 was subsequently repealed by PA 1961, No 44, effective May 20, 1961.   See PA 1961, No 44, § 1 (CLS 1961, § 780.581, Stat Ann 1963 Cum Supp § 28.872[1]); and section 13 as readopted with limiting addition by PA 1964, No 58 (CL 1948, § 764.13, Stat Ann 1964 Current Material § 28.871[1]).

"Our decision in *Hamilton*, adopting the exclusionary principle of *McNabb*, was planted not alone on the statutory requirements cited, but also upon Michigan's own constitutional guarantee of due process. Const 1908, art 2, § 16.[6] By guarding against 'actual or inferential judicial sanction of procedures which are violative either of section 13 or section 26,' we also sought to assure an accused 'the process that is due him,' p 419."

Thus it was that in 1960 this Court aligned itself with the United States Supreme Court's exclusionary principle announced in *McNabb* v. *United States*, 318 US 332 (63 S Ct 608, 87 L ed 819), by barring the courts of this State from admitting in evidence confessions obtained as the result of official illegality not limited only to those instances in which official illegality extends to the point of physicial or mental brutality or threats thereof. Such extreme official misconduct always in this State resulted in exclusion of confessions obtained thereby on the ground that they were involuntary. *Flagg* v. *People*, 40 Mich 706, *People* v. *Wolcott*, 51 Mich 612, and *People* v. *Stewart*, 75 Mich 21. In *People* v. *Hamilton* this Court extended the bar to exclude all confessions obtained during periods of illegal detention. Only by such resolute judicial condemnation of official illegality can free people be assured of their continuing freedom from police methods of a kind utilized by tyrannical governments but incompatible with our own democratic processes. Mr. Justice Brandeis, dissenting in *Olmstead* v. *United States*, 277 US 438 (48 S Ct 564, 72 L ed 944, 66 ALR 376), at p 485, stated the peril thus:

"Decency, security and liberty alike demand that government officials shall be subjected to the same

---

6 For our currently applicable due process clause, identical with our old, see Const 1963, art 1, § 17.

rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperilled if it fails to observe the law scrupulously. Our government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means—to declare that the government may commit crimes in order to secure the conviction of a private criminal—would bring terrible retribution. Against that pernicious doctrine this Court should resolutely set its face."

Forty-three years ago, in *People* v. *Halveksz,* 215 Mich 136, at 138, this Court, in rejecting evidence obtained illegally by police officers, stated its reason bluntly and with currently applicable pertinence to the standards of admissibility of a confession we announced in *Hamilton, supra:*

"Officers of the law must act within the law and if they invade the security guaranteed individuals by the Constitution, such invasion cannot bring to the aid of justice the fruit of their violation. It is the duty of courts, when attention is seasonably called to a violation of a constitutional right, in obtaining evidence in criminal prosecutions, to vindicate the protection afforded individuals by the Constitution, and suppress such evidence."

In *McCager, supra,* we held that since defendant's production in response to a writ of habeas corpus made his detention thereafter until final hearing on the writ the responsibility of the judge who issued the writ, defendant's confession obtained during such detention was not obtained during a period of illegal detention and could not be excluded from evidence on the authority of *People* v. *Hamilton,*

*supra,* absent any claim that the confession was the product of physical or psychological coercion. We expressed our holding in *McCager,* thus:

"For the purpose of this appeal from denial of defendant's motion to quash the information, based upon the claimed inadmissibility of defendant's confession on the ground that it was obtained during a period of illegal detention, we hold that his detention at the time the confession was made was not unlawful and, therefore, defendant's motion to quash the information was properly denied." 367 Mich 116, 125.

Quite obviously, if this Court had determined that McCager's detention at the time of his confession had been unlawful, it would have reversed the trial court's denial of his motion to quash. Here, in Ubbes, defendant's confession was obtained by the police during a period of unlawful detention, made unlawful because he was not promptly presented before a magistrate and because the delay in doing so manifestly was for the purpose of "sweating" a confession from him before he was advised of his rights by a judicial officer.

Upon the record made by the prosecution's own witnesses, the conclusion is inescapable that defendant was not promptly presented before a magistrate in the evening of the day on which he was arrested nor promptly on the following morning, not for the purpose of "booking" him and questioning him for such time of "brief delay" as is required to determine the immediate question of release or complaint, see *People* v. *Hamilton, supra,* page 416, but rather for the purpose of extracting a confession from him. First, the police officers had enough evidence formally to complain against defendant as soon as they arrested him; indeed, if they did not, they would not have had probable cause to effect

the arrest. Yet, the prosecution has failed to prove any justification of the delay such as we acknowledged we would accept in *Hamilton, supra,* at page 417, by our reference to *Mallory* v. *United States,* 354 US 449, at 455 (77 S Ct 1356, 1 L ed 2d 1479).[7] Second, granting the propriety of questioning a prisoner, following his arrest and prior to presenting him before a magistrate, for such brief period as is necessary to determine the immediate question of release or complaint by checking the prisoner's volunteered alibi or other exculpatory statements quickly verifiable, this defendant from the moment of his arrest until his confession the following day, according to the prosecution's own witnesses, maintained his complete lack of any knowledge whatever concerning the stolen arc welder's presence upon his property. There was, therefore, no alibi or other exculpatory statement requiring verification by the officers for the purpose of determining whether to release or complain against defendant. Third, the impermissible purpose of the interrogation was admitted on the record by one of the police officers involved. Indeed, perhaps because defendant continued to insist that he had no incriminating knowledge, two trained interrogators, Detective Muth and Detective Sergeant Lutz, were assigned to assist in the interrogation of defendant. As noted above, Detective Sergeant Lutz candidly testified that the purpose of his interrogation of the defendant was to get a confession from him. Even without such commendable candor, it defies even

---

[7] In *Hamilton, supra,* at p 417, we quoted the following from *Mallory, supra,* p 455:

" 'The duty enjoined upon arresting officers to arraign "without unnecessary delay" indicates that the command does not call for mechanical or automatic obedience. Circumstances may justify a brief delay between arrest and arraignment, as for instance, where the story volunteered by the accused is susceptible of quick verification through third parties. But the delay must not be of a nature to give opportunity for the extraction of a confession.' "

judicial credulity to suggest that interrogation such as was described by Detective Sergeant Lutz, and quoted above, constituted bona fide questioning to determine the immediate question of release or complaint. Furthermore, even without reliance upon defendant's own description of his interrogation, we would agree with Justice O'HARA that it offended against defendant's constitutional guaranties.

The record upon which we have drawn for our recitation of the testimonial facts is complete. It was made in September of 1961, almost a year and a half after our opinion in *People* v. *Hamilton, supra,* pointedly, pp 416 to 418, advised bench and bar the nature of proof necessary to excuse delay in prompt presentment of prisoners before magistrates. There are no such proofs in this record. This is not a case in which the ultimate facts depend upon the credibility of witnesses who have given conflicting testimony. Considering only the testimony of the prosecution's own witnesses, as we have, the confession of the defendant should have been excluded from evidence. We therefore reverse defendant's conviction and remand for further proceedings not inconsistent herewith.

While we plant our reversal of this conviction upon the erroneous admission into evidence of defendant's confession, because further proceedings on remand may result in a new trial it is necessary to consider also defendant's claim that the arc welder seized from his land was the product of an unlawful search and therefore should have been suppressed on his motions for suppression timely made before and during trial of the case.

## II.

The Constitution of 1908, in effect at the time of the events which here occurred, provided that:

"The person, houses, papers and possessions of every person shall be secure from unreasonable searches and seizures. No warrant to search any place or to seize any person or things shall issue without describing them, nor without probable cause, supported by oath or affirmation". Const 1908, art 2, § 10.

By that language our people sought, to the extent practically possible, to insure their security from historically familiar intrusions by the State into the private affairs of its citizens without prior judicial warrant based upon probable cause to believe that contraband or other forbidden objects were to be found. Only in certain restricted circumstances have searches made without search warrants been declared not unreasonable.[8] Thus, we have held that if an officer has probable cause to believe that a person has committed, or is in the process of committing, a felony or if that person is committing a misdemeanor in the officer's presence, then the officer is entitled to search that person and the immediate vicinity without a warrant. *People* v. *Kuntze*, 371 Mich 419. Even then, however, the scope of the search must be reasonable. See *People* v. *Gonzales*, 356 Mich 247.

In this case Trooper White had no search warrant, either when he first went upon the Ubbes farm or when he returned later and seized the arc welder. Had he seized the arc welder when he first discovered it, its seizure would have been unlawful, thereby

---

[8] We need not be concerned in this case with the proviso clause added to quoted article 2, § 10 of the 1908 Constitution by 1936 and 1952 amendments. (See PA 1953, p 438.—Reporter.)

necessitating its suppression from evidence. *People v. Lee,* 371 Mich 563. Unless we are to disbelieve the trooper's own testimony given at defendant's examination (from the testimonial record of which, and from a controverting affidavit of defendant, the trial judge disposed of the motion to suppress by denying it), he had no knowledge whatever regarding defendant or the presence of the arc welder on defendant's fenced-in property when he first entered that property without right to do so. Thus, there is no basis in this case, as there was none in *People v. Lee, supra,* for invoking any of the stated exceptions to the constitutional requirement of a search warrant at the time of Trooper White's first discovery of the arc welder. In *Lee,* the officer entered defendant's automobile without right to do so, by search warrant or otherwise, and while there seized narcotics found on the driver's seat. In holding the narcotics were illegally seized and thus inadmissible in evidence, this Court unanimously said, in its opinion written by Mr. Justice O'HARA:

"The constitutional safeguard [art 2, § 10 quoted above] against unreasonable searches and seizures, to be operative at all, manifestly must prohibit unauthorized *entries* into those places or things secured against the unreasonable search or seizure." 371 Mich 563, 568.

While *People v. Case,* 220 Mich 379 (27 ALR 686) might seem to suggest that Trooper White lawfully could have seized the arc welder upon his first unauthorized entry upon the defendant's land, our subsequent decisions in *People v. Gonzales,* 356 Mich 247, *People v. Zeigler,* 358 Mich 355, and *People v. Lee, supra,* have thoroughly vitiated the majority's opinion in *People v. Case.* In any event, in the course of specially classifying automobiles for pur-

poses of determining the legality of their search, the majority in *People* v. *Case* noted that "their active use is not in homes nor on private premises, the privacy of which the law especially guards from search and seizure without process", 220 Mich at 388. In Ubbes, of course, the arc welder was seized upon defendant's private premises.

Nor do we believe that Trooper White would have been entitled to seize the arc welder over defendant's objections upon his subsequent return to defendant's farm with the local police chief. Had defendant objected to the police officers' presence on his land and refused them permission to go back to where the arc welder was located, the officers could not have justified seizure of the arc welder under such circumstances, absent any probable cause at that time which would have supported the issuance of a search warrant. *People* v. *Alverson,* 226 Mich 342. In that case this Court held inadmissible evidence seized pursuant to a search warrant which had been issued on the basis of knowledge obtained by police officers during a prior illegal search of defendant's property. This Court held that procuring "a search warrant under the circumstances gave the search and seizure no legality" and, therefore, that defendant's motion to suppress the evidence and for discharge should have been granted. It hardly can be argued that Alverson would have been less entitled to suppression of the evidence seized had the officers' request for a search warrant been denied but they had, nonetheless, re-entered the defendant's property without permission and seized the evidence or had they, without even seeking a search warrant, re-entered the defendant's property without permission and seized the evidence. See *People* v. *Hagadorn,* 255 Mich 121, 124.

That which distinguishes this case of Ubbes from *People* v. *Alverson* is Trooper White's testimony at defendant's examination regarding the circumstances of his return to the Ubbes farm with the local police chief, which testimony the trial judge was entitled to accept for purposes of determining the admissibility of the arc welder. *People* v. *Burke,* 237 Mich 127, and *People* v. *Kramer,* 260 Mich 94. *But cf. People* v. *Zeigler,* 358 Mich 355, 364, 365, which, however, was decided prior to *Jackson* v. *Denno,* 378 US 368 (84 S Ct 1774, 12 L ed 2d 908), and the decision on rehearing in *People* v. *Walker,* 374 Mich 331. Trooper White testified at the examination, as he did also at trial, that when he confronted defendant with the fact that an arc welder reported to have been stolen was on his land, defendant made no objection to the officers' going back to the place where it was located and, at least tacitly, gave them his permission to do so by voluntarily accompanying them. Once there with defendant's permission, as the trial judge was entitled to find, the police officers had probable cause to believe that defendant was committing a felony by possession of stolen property of a value in excess of $100, adequate cause to support issuance of a search warrant, had one then been requested, and adequate cause to invoke the above stated exceptions to the constitutional requirement of a search warrant. Thus it is that there was no error in denying defendant's motions to suppress. Taking Trooper White's examination testimony at face value, as the trial judge was entitled to do, the arc welder was within the officers' lawful observation while they were lawfully upon defendant's land at the time of its seizure, thereby then giving the officers such probable cause to believe defendant guilty of its unlawful possession as would support

the issuance of a search warrant or invocation of the above-stated exceptions to the general rule. *People* v. *Kuntze,* 371 Mich 419.

Reversed and remanded for further proceedings consistent with this opinion.

KAVANAGH, C. J., and SMITH and ADAMS, JJ., concurred, with SOURIS, J.