PEOPLE *v.* HAMILTON.

1. CONSTITUTIONAL LAW—DUE PROCESS—EVIDENCE.

The aim of the requirement of due process is not to exclude presumptively false evidence, but to prevent fundamental unfairness in the use of evidence whether true or false (Const 1908, art 2, § 16).

2. CRIMINAL LAW—CONFESSION—UNLAWFULLY PROLONGED INCOMMUNICADO DETENTION—DUE PROCESS—ACCESS OF COUNSEL.

Admission of confession to charge of first degree murder in prosecution therefor *held,* a denial of due process, where defendant, a 19-year-old resident of Iraq in this country on a student visa, unable to speak English, and who had undergone an appendectomy 10 days before the homicide, was interrogated through an interpreter intermittently during 4-day period of incommunicado detention, not taken before a magistrate until the fifth day, and contact by an attorney, engaged for him, was repeatedly refused by police officers; there having been an unwarranted delay in defendant's detention without proven justification including a showing that not one of the many magistrates of a populous county was available (Const 1908, art 2, § 16; CL 1948, §§ 764.13, 764.26).

3. SAME—PRELIMINARY EXAMINATION—TIME.

Magistrates in this State are, for the purposes of prompt examination of apprehended persons, on legal duty at all times, including Sundays and holidays (CL 1948, §§ 764.13, 764.26).

Appeal from Recorder's Court of Detroit; Schemanske (Frank G.), J. Submitted January 14, 1960.

REFERENCES FOR POINTS IN HEADNOTES

[1] 12 Am Jur, Constitutional Law § 620.
[2] 20 Am Jur, Evidence §§ 499, 501.
Admissibility of confession as affected by delay in arraignment of prisoner. 19 ALR2d 1331.
[3] 14 Am Jur, Criminal Law § 240.

(Docket No. 67, Calendar No. 47,840.) Decided April 11, 1960. Rehearing denied June 7, 1960.

Maurice Hamilton was convicted of first degree murder. Reversed and remanded for new trial.

*Paul L. Adams,* Attorney General, *Samuel J. Torina,* Solicitor General, *Samuel H. Olsen,* Prosecuting Attorney, and *Samuel Brezner,* Assistant Prosecuting Attorney, for the people.

*Albert Summer* and *Ernest E. Ostrow,* for defendant.

BLACK, J.

"The aim of the requirement of due process is not to exclude presumptively false evidence, but to prevent fundamental unfairness in the use of evidence whether true or false." *Lisenba* v. *California,* 314 US 219, 236 (62 S Ct 280, 86 L ed 166), quoted in *Blackburn* v. *Alabama,* 361 US 199 (80 S Ct 274, 280, 4 L ed 2d 242, 248).

I hold that admission in evidence of defendant Hamilton's confession deprived him of process due by our Constitution (1908) and criminal code*, to say nothing of the process that is due by supreme law.

---

* The Constitutional reference is to article 2, § 16. The statutory references read as follows:

"A peace officer who has arrested a person without a warrant must without unnecessary delay, take the person arrested before the most convenient magistrate of the county in which the offense was committed, and must make before the magistrate a complaint, stating the offense for which the person was arrested." Section 13, chapter 4, code of criminal procedure (CL 1948, § 764.13 [Stat Ann 1954 Rev § 28.872]).

"Every person charged with a felony shall, without unnecessary delay after his arrest, be taken before a magistrate or other judicial officer and, after being informed as to his rights, shall be given an opportunity publicly to make any statement and answer any questions regarding the charge that he may desire to answer." Section 26, chapter 4, code of criminal procedure (CL 1948, § 764.26 [Stat Ann 1954 Rev § 28.885]).

Maurice Hamilton and Victoria Hirmiz were charged in the first degree with having murdered Victoria's husband, Aziz Hirmiz. They were tried together in Detroit recorder's court. The jury found defendant Hamilton guilty of murder as charged and defendant Hirmiz "not guilty by reason of insanity." Defendant Hamilton was sentenced to life imprisonment "without favorable recommendation." He appeals to this Court upon leave granted.

Hamilton was born in and is a citizen of Iraq. He lived there until September of 1955, when he came to Detroit on authority of a student visa for the purpose of "learning to be a mechanic." He could not speak English* and had learned but few English words in the short time between arrival in Detroit and indictment there. Aged 19 at the time, he had never previously been "involved with the law."

Mr. and Mrs. Hirmiz had been acquainted with Hamilton in Iraq. Mr. Hirmiz had been a neighbor, there, of Hamilton's family. Mrs. Hirmiz had been a friend of Hamilton's mother in Baghdad.

The homicide occurred during the night of February 9-10, 1956, in the Detroit apartment of Mr. and Mrs. Hirmiz. Mr. Hirmiz was found knifed to death. The police, called during the morning of February 10th, found his body in a bedroom of the Hirmiz apartment. They also found Mrs. Hirmiz in an adjacent room with her hands tied behind her and her feet tied to a table. She insisted that "a colored man" had entered the apartment and, after having killed her husband, that he tied her up in the manner described. Her story changed later.

---

* The prosecuting attorney advises that "Neither (referring to both defendants) spoke English, and though both spoke Arabic, the native tongue of each was Chaldean, a dialect used in Iraq."

Shortly after arrival of the police Hamilton and Mrs. Hirmiz' brother, Azzawi Haisha, came to the apartment. The 2 defendants thereupon were arrested and taken to police headquarters for interrogation. There they were detained, incommunicado excepting as presently indicated, until each confessed. Mrs. Hirmiz' confession was obtained by the police Saturday morning, February 11th. Implicating Hamilton as wielder of the knife, she said he was to be paid—or had been paid—by her for the homicide and that she had instructed him to tie her up for the purpose of supporting her first story. The police thereupon employed her confession to obtain Hamilton's confession. He did not yield until Monday. His confession was recorded about 10 in the evening of that day, February 13th.

One Jamil Jalaba, friend of Mr. and Mrs. Hirmiz and of Hamilton, communicated the content of Mrs. Hirmiz' confession to Hamilton. It is apparent from the record that Jalaba, doubtless in good faith,[*] aided the police in bringing about Hamilton's confession by talking repeatedly with Hamilton alone and in the presence of officers Areeda and Clinton, on 1 occasion for 2 hours. (The situation in such regard is much like that shown in *Spano* v. *New York,* 360 US 315 [79 S Ct 1202, 3 L ed 2d 1265], save only that there are incomprehensible voids in the record of what Jalaba told Hamilton.) According to officer Clinton (talking with Hamilton through Jalaba at conclusion of Hamilton's confession), "He (Ham-

---

[*] The prosecuting attorney, characterizing Jalaba's testimony, tells us:

"It is readily apparent from Jalaba's testimony that he was eager to assist Hamilton, and went to police headquarters to see appellant after talking to a lawyer and learning that the latter would not act without authority from Hamilton's father because appellant was a minor."

Later in the day Jalaba talked by long distance with someone in Baghdad. It is not clear whether the person talked with was or was not one of Hamilton's parents.

ilton) was firmly convinced that no matter what happened to him that the worst that could happen would be that he would be or he would face deportation." Much of this testimonial uncertainty is due, of course, to the necessary and steady employment of interpreters and the manifest difficulty of recording testimony properly, the Chaldean and Arabic dialects of important witnesses being different.

From this point forward the record discloses much dispute and uncertainty. If Hamilton is believed, he was mistreated scandalously by the officers between the Friday morning arrest and the time of the Monday confession. The officers testified to the contrary, and at detailed length.* We need not, however, evaluate these typically disputed versions of the interrogation period, the following facts having been clearly established.

From the time of arrest February 10th, and continuously until his confession was obtained and recorded February 13th, defendant Hamilton was interrogated periodically by police officers—without pretense of effort on their part to comply with quoted section 13 of the criminal code—for the purpose of obtaining from him a confession of guilt. Even when Mrs. Hirmiz' confession was obtained the police did not comply with the requirements of said sections 13 and 26 of the code. Hamilton was not arraigned, or taken before a magistrate, until Tuesday morning, February 14th. During the 50-odd hour period between the 2 confessions an attorney sought to see Hamilton professionally. The attorney was refused access, not once but several times, having been sent first to one officer and then to others on various floors

---

* Hamilton's appendix had been removed some 10 days prior to the date of the homicide. Whether on account of opening of the surgical incision, as Hamilton claimed in his testimony, or whether he "went into a convulsion" as testified by one of the officers, he was hospitalized for several hours—by order of the police—during the Sunday of his detention.

of the headquarters building.*   He finally gave up.
The only excuse given by the State for such refusal
of access is one of suggestion that the attorney was
soliciting business; that the officers had a right to
find out, as a condition of access as sought, the nature
of the attorney's retainer and identity of the person
who paid him and arranged for his services, and
that the attorney was unable to satisfy the officers
that he did represent Hamilton or had been engaged
properly in Hamilton's behalf.   And the principal
excuse for failure to comply with requirements of the
2 quoted sections of the code is that "he could not
have been arraigned Saturday afternoon, or Sunday,
or on Monday, February 13th, a holiday."   No testi-
mony supports this last representation.   Neither
does the law.

Thus we face a recurrent question of due process
of law; whether in the presented circumstances Ham-
ilton's confession of guilt—of first degree murder—
was shown by the prosecution as having been vol-
untary and so receivable in evidence.   I hold it was
not, and refer particularly to said sections 13 and
26 in conjunction with the reasoning of *Mallory* v.
*United States,* 354 US 449 (77 S Ct 1356, 1 L ed 2d
1479), and *Upshaw* v. *United States,* 335 US 410 (69
S Ct 170, 93 L ed 100).†   That reasoning should be

---

* The attorney testified:
"*Q.* Then it was 4 or 4-1/2 hours you spent chasing around police
headquarters trying to see Maurice Hamilton, is that correct?
"*A.* That is correct."

† "We hold that this case falls squarely within the *McNabb* ruling
[*McNabb* v. *United States,* 318 US 332 (63 S Ct 608, 87 L ed 819)]
and is not taken out of it by what was decided in the *Mitchell
Case* [*United States* v. *Mitchell,* 322 US 65 (64 S Ct 896, 88 L ed
1140)].   In the *McNabb Case* we held that the plain purpose of the
requirement that prisoners should promptly be taken before com-
mitting magistrates was to check resort by officers to 'secret in-
terrogation of persons accused of crime.'   We then pointed out the
circumstances under which petitioners were interrogated and con-
fessed.   This was done to show that the record left no doubt that
the McNabbs were not promptly taken before a judicial officer as the
law required, but instead were held for secret questioning, and (p
345) 'that the questioning of the petitioners took place while they

inosculated with quoted sections 13 and 26 quite as firmly as if written therein.

Hamilton's continued detention was unwarranted and so unlawful under these sections. It was unlawful because the delay was unnecessary, and unlawful because its manifest purpose was that of "sweating" a confession after the officers were fully enabled to complain and arraign according to the requirements of said section 26. His unjustifiably continued detention, coupled as it was with undisputed proof that counsel engaged for him was, during such detention, refused even limited conference, amounted to a denial of due process. Said sections 13 and 26, and Rule 5(a) of the Federal rules of criminal procedure*, are quite alike and equally mandatory. Each requires that the person arrested be taken "without unnecessary delay" before a judicial officer for the purposes of complaint and proceedings subsequent thereto.

This does not mean that an arrested person cannot be "booked" and questioned for such time of "brief delay" as presented circumstances fairly require in order to determine the immediate question of release or complaint (*Mallory, supra,* at pages 454,

---

were in the custody of the arresting officers and before any order of commitment was made.' The McNabb confessions were thus held inadmissible because the McNabbs were questioned while held in 'plain disregard of the duty enjoined by congress upon Federal law officers' promptly to take them before a judicial officer." *Upshaw, supra,* at pages 412, 413.

* Having quoted said Rule 5(a), the court in *Mallory* said of it (p 452):

"This provision has both statutory and judicial antecedents for guidance in applying it. The requirement that arraignment be 'without unnecessary delay' is a compendious restatement, without substantive change, of several prior specific Federal statutory provisions. (*E. g.,* 20 Stats 327, 341, 342; 48 Stat 1008; also 28 Stat 416.) See Dession, The New Federal Rules of Criminal Procedure, 55 Yale LJ 694, 707. Nearly all the States have similar enactments." (For Rule 5(a) see 18 USCA, Federal Rules of Criminal Procedure, p 115; see, also, 327 US 821, 835.—Reporter.)

455 and *Cicenia* v. *LaGay,* 357 US 504, 509, 510 [78
Ct 1297, 2 L ed 2d 1523]). It does mean that an un-
necessary and so unlawful delay of compliance with
either of said sections 13 and 26, when done for pro-
longed interrogatory purposes and without proven
justification of the delay,* renders involuntary and
so inadmissible whatever confessional admissions the
detained person may have made while so unlawfully
detained.

Here the delay (from and after, at least, the time
of Mrs. Hirmiz' confession) was "unnecessary" as
a matter of law. It admits of no defense on account
of the claimed intervention of the half and whole
holidays of Saturday, Sunday and Monday. Ham-
ilton should have been taken before a magistrate no
later than Saturday afternoon, immediately follow-
ing the confession of his codefendant. And it will
not do so say or infer that the magisterial courts of
Wayne county were closed and remained so until
the following Tuesday. Magistrates of Michigan
are, for the purposes of said sections 13 and 26, on
legal duty at all times; Sunday, holidays or no. See
*Linnen* v. *Banfield,* 114 Mich 93, 97, wherein pertinent
statutes yet in effect (How Stat § 1591; CLS 1956,
§ 435.101 [Stat Ann 1957 Rev § 18.861], and How
Stat § 7250; CL 1948, § 604.12 [Stat Ann § 27.471])
were construed as keeping our magisterial courts
continuously open for such purposes. There is, final-
ly, no proof here tending to show that not one of the
many magistrates of Wayne county was available
during such intervening days. It is not even shown
that an unsuccessful effort was made during the time

---

* "The duty enjoined upon arresting officers to arraign 'without un-
necessary delay' indicates that the command does not call for me-
chanical or automatic obedience. Circumstances may justify a brief
delay between arrest and arraignment, as for instance, where the
story volunteered by the accused is susceptible of quick verification
through third parties. But the delay must not be of a nature to
give opportunity for the extraction of a confession." *Mallory, supra,*
p 455).

between the respective confessions to invoke the indicated services of one or more of them.

This construction of our rules of criminal procedure will bring them to necessitous concord with corresponding features of Federal Rule 5(a). Too, it will mean that constitutional due process means the same thing in Michigan, to an arrested person, whether he is charged or to be charged with violation of State or Federal law. We have our own guarantee of due process.* Let us attend its enforcement.

Admittedly, some of these conclusions collide with the "question-of-fact" doctrines found in cases like *Mooradian* v. *Davis,* 302 Mich 484; *Oxford* v. *Berry,* 204 Mich 197; *Leisure* v. *Hicks,* 336 Mich 148; and *Hammitt* v. *Straley,* 338 Mich 587. But such doctrines now, considering intervening decisions of the Supreme Court found in recent annotations, 1 L ed 2d 1735, to which should be added *Crooker* v. *California,* 357 US 433 (78 S Ct 1287, 2 L ed 2d 1448); *Spano* v. *United States, supra,* and *Blackburn* v. *Alabama, supra,* live perilously at best. No longer, our alternative task being that of determination whether Hamilton's confession was admissibly voluntary as a matter of federally guaranteed due process, may we escape the duty of independent examination of the record; apart from fact-findings below. *Norris* v. *Alabama,* 294 US 587 (55 S Ct 579, 79 L ed 1074); *Spano* v. *New York, supra.* Such Federal question is squarely before us unless, of course, this Court concludes in lieu of its determination that Hamilton's confession was erroneously received in evidence by the standards of Michigan law.

---

* "No person shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty or property, without due process of law." (Const 1908, art 2, § 16).

Here, as in *Cicenia, supra*\*, a feeling of "strong distaste" generates from the protracted detention in violation of law of this youthful—and ill if not terrified—subject of another country; one whose comprehension of English words and of American processes of justice—including the consequences of such processes—must have been substantially nil, much as if he were shown as being of low or uneducated mentality; meanwhile denying access of counsel to him, all for the record-evident purpose of extracting a confession of guilt of murder in the first degree. As in *McNabb, supra,* we can and should deal with such a situation prospectively under our supervisory powers, guarding thus against more actual or inferential judicial sanction of procedures which are violative either of section 13 or section 26. At the same time we can and should assure to this accused person the process that is due him.

My conclusion upon this record was announced in the preamble above. The trial judge erred in receiving, over objection, defendant Hamilton's confession of guilt. On that account I would reverse the judgment of the trial court and order that Hamilton be tried anew.

DETHMERS, C. J., and CARR, KELLY, SMITH, EDWARDS, KAVANAGH, and SOURIS, JJ., concurred. — —·· —

---

\* "We share the strong distaste expressed by the 2 lower courts over the episode disclosed by this record. *Cf. Stroble* v. *California,* 343 US 181, 197, 198 (72 S Ct 599, 96 L ed 872). Were this a Federal prosecution we would have little difficulty in dealing with what occurred under our general supervisory power over the administration of justice in the Federal courts. See *McNabb* v. *United States,* 318 US 332 (63 S Ct 608, 87 L ed 819)." *Cicenia* v. *LaGay, supra,* pp 508, 509.