PEOPLE *v*. BESONEN.

1. CRIMINAL LAW—SUFFICIENCY OF EVIDENCE—OPPORTUNITY—FALSE EXCULPATORY STATEMENTS—SECOND-DEGREE MURDER.

The people must show more than mere opportunity to commit a crime, coupled with false exculpatory statements, in order to justify a conviction of second-degree murder (CL 1948, § 750-.314).

REFERENCES FOR POINTS IN HEADNOTES

[1–3] 26 Am Jur, Homicide § 455 *et seq.*
[4] 21 Am Jur 2d, Criminal Law § 445 *et seq.*
[5] 21 Am Jur 2d, Criminal Law § 440
20 Am Jur, Evidence § 499
[6, 7] 20 Am Jur, Evidence §§ 498, 499.
Admissibility of pretrial confession in criminal case—Supreme Court cases. 1 L ed 2d 1735, 4 L ed 2d 1833, 12 L ed 2d 1340.
[8, 12] 53 Am Jur, Trial § 459.
[9–11] 42 Am Jur, Prosecuting Attorneys § 20.

2. SAME—CIRCUMSTANTIAL EVIDENCE—INNOCENT MAN—DECEPTION.

An innocent man, when placed by circumstances in a condition of suspicion and danger, may resort to deception in the hope of avoiding the force of such proofs.

3. SAME—EVIDENCE—SUFFICIENCY.

It takes something more than a robust suspicion to convict a defendant in a criminal case.

4. SAME—PRELIMINARY EXAMINATION—TIME.

Magistrates in this State, for the purposes of prompt examination of apprehended persons, are on legal duty at all times, including Sundays and holidays (CL 1948, §§ 764.13, 764.26).

5. SAME—EXCULPATORY STATEMENT—UNLAWFULLY PROLONGED DETENTION—DUE PROCESS.

Admission in prosecution for second-degree murder of exculpatory statement *held*, a denial of due process, where defendant was interrogated intermittently for 5 days, was brought to court on the 4th day on writ of habeas corpus, disposition of the writ was adjourned for 24 hours and ultimately dismissed on the 6th day, when defendant was arraigned on warrant charging second-degree murder, there having been an unwarranted delay in defendant's detention without proven justification including a showing that not one of the many magistrates of a populous county was available (CL 1948, §§ 750.317, 764.13, 764.26).

6. SAME — VOLUNTARY STATEMENT — UNLAWFUL DETENTION — DUE PROCESS.

An unnecessary, and so unlawful, delay in bringing an arrested person before a magistrate as required by statute when done for interrogatory purposes and without proven justification of the delay, renders involuntary, and so inadmissible, whatever confessions, admissions and statements, whether inculpatory or exculpatory, the detained person may have made while so unlawfully detained (CL 1948, §§ 764.13, 764.26).

7. SAME—DUE PROCESS—SELF-INCRIMINATION—INCULPATORY OR EXCULPATORY STATEMENTS.

The privilege against self-incrimination protects the individual from being compelled to incriminate himself in any manner and does not distinguish degrees of incrimination, and no distinction may be drawn between inculpatory statements and those alleged to be merely exculpatory.

8. Same—Inadmissible Testimony—Reversible Error.

Attempt by prosecutor to interrogate defendant as to matters previously ruled inadmissible by the court in prosecution for second-degree murder *held*, reversible error, where the prosecutor knew that he could not prove the very facts which his questions assumed (CL 1948, § 750.317).

9. Same—Prosecutor—Duty in Criminal Case.

A prosecutor's interest in a criminal prosecution is not that he shall win a case, but that justice shall be done, that guilt shall not escape or innocence suffer.

10. Same—Duty of Prosecutor in Criminal Case.

It is as much a prosecutor's duty in a criminal prosecution to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

11. Same—Conduct of Prosecutor.

Improper suggestions, insinuation, and assertions of personal knowledge by a prosecutor are apt to carry much weight against the accused when they should properly carry none because the average jury has confidence that the obligations, which so plainly rest upon a prosecutor, will be faithfully observed.

12. Same—Cross-Examination—Improper Questions—Objection.

Cross-examination of defendant, charged with second-degree murder, relative to alleged ill-feelings between defendant and decedent, which subject had previously been ruled inadmissible and which had the effect of placing in the minds of jurors some idea that defendant may have quarreled with decedent, even though the evidence showed defendant and decedent were on friendly terms, constituted prejudicial error notwithstanding defendant answered all the questions in the negative and the failure of defendant's counsel to object to such line of questioning did not nullify the error (CL 1948, § 750.317).

Appeal from Recorder's Court of Detroit; Groat (Gerald W.), J. Submitted Division 1 February 10, 1966, at Detroit. (Docket No. 37.) Decided September 13, 1966.

Woodrow Besonen was convicted of second-degree murder. Defendant appeals. Reversed and remanded for new trial.

*Frank J. Kelley*, Attorney General, *Robert A. Derengoski*, Solicitor General, *Samuel H. Olsen*, Prosecuting Attorney, *Samuel J. Torina*, Chief Appellate Lawyer, and *Angelo A. Pentolino*, Assistant Prosecuting Attorney, for the people.

*John D. O'Connell*, for defendant.

J. H. GILLIS, P. J. Upon leave granted by the Supreme Court the defendant, Woodrow Besonen, prosecutes this appeal from his conviction on September 24, 1959, of second-degree murder.[1]

The body of George Sweigert was found partly submerged in the laundry tubs in the basement of his home on the morning of February 6, 1959. He was killed by a blunt instrument that was used to inflict multiple compound fractures of the skull and bones of the face. A bloodstained ball-peen hammer was found near the body. There was a considerable amount of blood on the basement floor and a streak of blood leading from the stairway to the laundry tubs. The first floor had been ransacked by either a burglar or someone wanting it to appear that a burglary had occurred.

An autopsy was performed late on February 6th, from which the medical examiner determined the time of death to be 9 p.m. on February 5th, plus or minus 3 to 4 hours. Sweigert had a 6:30 p.m. appointment with his doctor, which he did not keep.

The defendant and Sweigert were close friends. They had worked for the same employer for several years and for some time had been driving to work together. Normally the defendant would come to Sweigert's home about 6:45 in the morning and ride to work in Sweigert's car. They usually would arrive at work at about 7:20.

On February 5th the defendant and Sweigert left work at 4:30 p.m. and went to a bar where they had a couple of drinks. They left the bar together,

---

[1] CL 1948, § 750.317 (Stat Ann 1954 Rev § 28.549).—REPORTER.

apparently on friendly terms, and were seen outside Sweigert's home about 5:15 p.m. Defendant testified that he immediately drove home, but this was contradicted by testimony of a neighbor who said he saw the defendant standing by his car while Sweigert assisted a lady whose automobile was stuck on the ice. There was no evidence that the defendant entered Sweigert's home nor at any time was there testimony that the defendant and Sweigert were on anything but friendly terms.

On February 6th the defendant arrived at work about 7 a.m. He testified that he arrived early because he had to put up tarps that day before work could begin. The defendant told fellow workers that he had gone by Sweigert's home, knocked on the door and "got no answer." There were no lights on and he left and came to work in his own car. After he had been on the job approximately half an hour, the defendant called the general superintendent and told him he had gone to Sweigert's home "and he knocked on the door and he didn't get no answer."

That afternoon the body was discovered. The defendant was interviewed at his home by detectives and when they "didn't get a satisfactory answer" from the defendant they placed him under arrest.

The defendant was questioned intermittently that afternoon and evening and during the next day (February 7). That evening at about 10:30 defendant's attorney came to police headquarters. According to the examination testimony of a police officer, the attorney was not refused permission to see the defendant, but it was suggested that since the hour was late he should come back on Sunday and that this was agreed to by the attorney.

During the investigation, the clothing worn by the defendant on the day the offense occurred was examined for bloodstains. On the inside left pant leg a bloodstain 1/32 of an inch in diameter was found. Due to the size of the stain, it was marked "insufficient for human blood type identification"

by the examiner at the Detroit police department
scientific laboratory.

On February 9, 1959, the defendant was brought
to court on a writ of habeas corpus. Disposition of
the writ was adjourned for 24 hours; adjourned on
February 10th for an additional 24 hours; and ulti-
mately dismissed on February 11th, when the de-
fendant was arraigned on a warrant charging
second-degree murder. Approximately two hours
after the first adjournment, the defendant made a
statement which was stenographically recorded and
read into evidence at defendant's trial. During the
trial the defendant testified in his own behalf. The
discrepancies in his statements to the police, and to
coworkers, and his trial testimony were fully ex-
plored on cross-examination.

The foregoing recital of facts indicates the nature
of the people's case against the defendant. The
people sought to prove that the defendant was at
Sweigert's home as late as 5:15 on the afternoon
of the 5th; that Sweigert died at 9 p.m., plus or
minus 3 to 4 hours; and that defendant failed to
report to the authorities when he saw evidence of
foul play at the decedent's home on the morning of
the 6th.

The sufficiency of the evidence is not raised in
this appeal. We do not, therefore, decide whether
the evidence was sufficient to justify conviction.[2]

---

[2] It is often fruitless to seek precedents to support an argument
involving sufficiency or insufficiency of the evidence but it seems clear
that the people must show more than mere opportunity to commit the
crime, coupled with false exculpatory statements. *Cf. Cooper* v.
*United States* (1954), 94 App DC 343 (218 F2d 39). *United
States* v. *McConney* (CA 2, 1964), 329 F2d 467. As Chief Justice
Shaw noted in the famous case of *Commonwealth* v. *Webster*, 5 Cush
[59 Mass] 295, 317, "An innocent man, when placed by circum-
stances in a condition of suspicion and danger, may resort to decep-
tion in the hope of avoiding the force of such proofs."

Additionally, there is some evidence tending to point to the defend-
ant's innocence. The homicide was a particularly bloody one and it
was the theory of the police that the murderer dragged Sweigert
to the laundry tubs after the blows were struck. Yet no blood was
found on the defendant's person or his clothing except for a small
spot approximately 1/32 of an inch in diameter on the *inside* of
one pant leg. The specimen was too small to determine whether or

We discuss the evidence only to show that the case against the defendant was circumstantial and slight. Defendant's claims of error will be viewed by this Court in that light. *Cf. Fiswick* v. *United States* (1946), 329 US 211, 217, 218 (67 S Ct 224, 91 L ed 196).

The defendant was arrested Friday afternoon, questioned that day and the next, gave conflicting stories, and still was not arraigned.[3] There is a dearth of evidence that the defendant was represented by or advised of his rights to an attorney prior to or during any of these statements made on February 6th or 7th. Even allowing a reasonable time to investigate defendant's statement, there is no excuse for failing to arraign the defendant Saturday night or Sunday as then required by CL 1948, § 764.13 (Stat Ann 1954 Rev § 28.872),[4] and CL 1948, § 764.26 (Stat Ann 1954 Rev § 28.885).

"Magistrates of Michigan are  *  *  *  on legal duty at all times; Sundays, holidays or no." *People* v. *Hamilton* (1960), 359 Mich 410, 417.

The people argue that the statements obtained from the defendant from the time of his arrest on February 6th until arraignment on February 11th were not confessions but exculpatory statements

---

not it was human blood. Furthermore, the defendant's fingerprints did not appear on the murder weapon or elsewhere in the house as far as the record shows although fingerprint experts went over the house carefully.

"It takes something more than a robust suspicion to convict a defendant in a criminal case." *United States* v. *Carengella* (CA 7, 1952), 198 F2d 3, 7, cert denied, 344 US 881 (73 S Ct 179, 97 L ed 682), citing *United States* v. *Wainer* (CA 7, 1948), 170 F2d 603, 606.

[3] *The conflict in his statements* arose when he first told the officers he did not enter the house on the morning of the 6th and then admitted he entered the house and saw what appeared to be either mud or bloodstains on the basement floor. When asked why he didn't tell anyone what he had seen, the defendant answered "I just didn't." This statement was made at approximately 4 p. m. on February 7th. Both of these statements were offered and admitted into evidence.

[4] Currently covered by CLS 1961, § 780.581 (Stat Ann 1965 Cum Supp § 28.872[1]).

and were not, therefore, within the rule of *People*
v. *Hamilton, supra*. We do not read *Hamilton* so
narrowly. Its rule of exclusion was intended to
deny the police authority to conduct prolonged in-
terrogation of a suspect. Viewed in this light, it is
obvious that the *Hamilton* exclusionary rule applies
to confessions, admissions and statements, whether
inculpatory or exculpatory. While the recent de-
cision of *Miranda* v. *Arizona* (1966), 384 US 436
(86 S Ct 1602, 16 L ed 2d 694, 10 ALR3d 974) only
applies to cases in which the trial began after the
date of decision we feel the following succinctly
states our position concerning inculpatory and ex-
culpatory statements:

"The privilege against self-incrimination protects
the individual from being compelled to incriminate
himself in any manner; it does not distinguish de-
grees of incrimination. Similarly, for precisely the
same reason, no distinction may be drawn between
inculpatory statements and statements alleged to be
merely 'exculpatory.' If a statement made were in
fact truly exculpatory it would, of course, never be
used by the prosecution. In fact, statements merely
intended to be exculpatory by the defendant are
often used to impeach his testimony at trial or to
demonstrate untruths in the statement given under
interrogation and thus to prove guilt by implication.
These statements are incriminating in any meaning-
ful sense of the word." *Miranda* v. *Arizona, supra,*
at pp 476, 477. See, also, *Johnson* v. *New Jersey*
(1966), 384 US 719 (86 S Ct 1772, 16 L ed 2d 882).

The real test to be applied is whether the state-
ment turned out to be incriminating. *Wong Sun* v.
*United States* (1963), 371 US 471 (83 S Ct 407, 9
L ed 2d 441).

The defendant's conviction became final in 1959
when the period for filing a timely application for
leave to appeal had expired. But for this fact we
would be required to reverse the conviction because

of the exclusionary rule announced in *Hamilton,*
*supra.* When the Michigan Supreme Court an-
nounced its decision in *Hamilton* it carefully noted
that its decision would operate "prospectively under
our supervisory powers." 359 Mich at 419. Since
we reverse this case for another reason it might be
well to say at this time that in any subsequent trial
of the defendant the statements taken from him
during the period of illegal detention may not be
admitted in evidence under the *Hamilton* rule.

There is a compelling reason for reversing this
conviction. During the course of the trial the as-
sistant prosecutor introduced testimony to show
that some two weeks prior to the homicide the de-
fendant was with the wife of the decedent's brother-
in-law. She related an attempt by the defendant to
molest her which she successfully resisted. An im-
mediate objection by the defendant was made and
the jury was then excused. The following colloquy
then took place:

"*Mr. Pentolino* [Prosecutor]: I think it is within
point of time because they later told George Swei-
gert about what happened in this kitchen, and *we*
*have reason to believe* that George told Besonen.
"*Mr. Chalfin:* How are you going to put that in
evidence with a dead man?
"*Mr. Pentolino: I admit we are over the barrel,*
but I think we can lead up to circumstances, from
what was an amicable association to what was a
complete breaking off." (Emphasis supplied.)

This incident involving a woman who was not a
relative or close friend of the decedent[5] and occur-
ring nearly two weeks prior to the homicide had no
probative value whatsoever and was clearly prejudi-

---

[5] She testified, in identifying the decedent's body, as follows:
"Q. Did you know one George Sweigert in his lifetime?
"A. No. I have only known him—well let me see—just a little
over 2 years when I married [his brother-in-law]."

cial. When the jury returned to the courtroom, the court instructed them that the testimony was stricken and they were told to disregard it.

We should note that we are taking into consideration the studied manner in which this evidence was placed before the jury. The excerpt from the transcript which we have quoted above shows that the prosecutor knew at the time he sought to introduce the evidence that it was totally inadmissible. He conceded that he was "over the [a] barrel." To aggravate the prejudice to the defendant, the prosecutor ignored the ruling of the court excluding the evidence when he subsequently asked the defendant on cross-examination:

"*Q.* [By Mr. Pentolino] Isn't it true, Mr. Besonen, that he was riled up because of your conduct and attitude after long periods of consistent drinking, is that true? * * *

"*Q.* Isn't it true, * * * Mr. Besonen[,] that he accused you of your bad conduct and told you that he did n't want you there any more?"

The court had already ruled on the subject and there was no reason—no legitimate reason—for bringing the matter to the jury's attention again.

These questions were remarkably similar to those that were so severely condemned in *Berger* v. *United States* (1935), 295 US 78 (55 S Ct 629, 79 L ed 1314).[6]

---

[6] "The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

"It is fair to say that the average jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed. Conse-

The prosecutor knew that he could not prove the very facts which his questions assumed. Indeed, as we have already noted, the evidence unequivocally showed that the defendant and the decedent were on friendly terms right up to the moment they were last seen together on the day of the homicide.

The failure of defendant to move for a mistrial or to object to the prosecutor's cross-examination does not preclude us from granting a new trial if the interests of justice require. *Cf. People* v. *Ruggero* (1923), 223 Mich 368; *People* v. *Ignofo* (1946), 315 Mich 626.

The conviction is set aside and case remanded for a new trial.

FITZGERALD, J., concurred.

The late Judge WATTS who was a member of the panel of judges to whom this case was submitted for determination took no part in this decision.

---

quently, improper suggestions, insinuations and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none. The court below said that the case against Berger was not strong; and from a careful examination of the record we agree. Indeed, the case against Berger, who was convicted only of conspiracy and not of any substantive offense as were the other defendants, we think may properly be characterized as weak—depending, as it did, upon the testimony of Katz, an accomplice with a long record.

"In these circumstances prejudice to the cause of the accused is so highly probable that we are not justified in assuming its nonexistence. If the case against Berger had been strong, or, as some courts have said, the evidence of his guilt 'overwhelming,' a different conclusion might be reached." *Berger* v. *United States* (1935), 295 US 78, 88, 89 (55 S Ct 629, 79 L ed 1314). *Cf. People* v. *Dane* (1886), 59 Mich 550.