PEOPLE *v.* WAVIE WILLIAMS

PEOPLE *v.* GARDNER

1. CONSTITUTIONAL LAW — TRIAL — HARMLESS ERROR — REASONABLE DOUBT.
   A court must be able to declare a belief that a federal constitutional error is harmless beyond a reasonable doubt before that error can be held harmless.

2. CONSTITUTIONAL LAW—TRIAL—BASIC RIGHTS—HARMLESS ERROR.
   Some constitutional rights are so basic to a fair trial that their infraction can never be treated as harmless error.

3. CONSTITUTIONAL LAW—TRIAL—HARMLESS ERRORS.
   Not all trial errors which violate the federal constitution automatically call for a reversal.

4. CONSTITUTIONAL LAW—CRIMINAL LAW—EVIDENCE—CUMULATIVE— TAINTED—CRIMINAL INGREDIENTS—HARMLESS ERROR.
   A decision of the United States Supreme Court that not all trial errors which violate the federal constitution automatically call for a reversal does not suggest that, if evidence bearing on all the ingredients of the crime is tendered, the use of cumulative evidence, though tainted, is harmless error.

5. CRIMINAL LAW—EVIDENCE—EXTRAJUDICIAL STATEMENTS—ADMISSIBILITY—WITNESSES—CONFRONTATION.
   Admission of a detective's testimony regarding an oral exculpatory statement made to him by a defendant which implicated a co-

REFERENCES FOR POINTS IN HEADNOTES

[1–4] 21 Am Jur 2d, Criminal Law § 223.
[5, 12] 29 Am Jur 2d, Evidence §§ 539, 540.
[6, 7] 5 Am Jur 2d, Appeal and Error § 726.
[8–10] 29 Am Jur 2d, Evidence §§ 537, 547.
[11] 21 Am Jur 2d, Criminal Law § 319.
[13] 21 Am Jur 2d, Criminal Law § 315.
[14] 5 Am Jur 2d, Criminal Law § 821.

defendant in the crimes charged was merely cumulative and harmless error and did not deny the implicated defendant his constitutional right of confrontation of witnesses where not only did the testimony of eyewitnesses place the implicated defendant at the scene of the crime and identify him as the person who shot a proprietor of the robbed store, but also the trial court instructed the jury that the admitted statement was not binding upon the implicated defendant, as he was not present when the defendant-declarant made it, that they were to disregard the admitted statement when considering the testimony regarding the implicated defendant, and the implicated defendant admitted his guilt of the crimes charged when he was before the court for sentencing.

6. APPEAL AND ERROR—PRESERVING QUESTION.

Trial court errors will not generally be considered on appeal where no objection was made at trial.

7. APPEAL AND ERROR—EVIDENCE—PRESERVING QUESTION.

A prosecution witness' testimony regarding the death of an alleged participant in the crimes with which defendant was charged and of the conviction and sentencing of another participant to 25 to 50 years could not be objected to on appeal where defendant failed to object to that testimony at trial.

8. CRIMINAL LAW—ARREST—ARRAIGNMENT—UNNECESSARY DELAY—EXTRAJUDICIAL STATEMENTS—EXCLUSIONARY RULE.

An unnecessary and therefore an unlawful delay between an accused's arrest and arraignment, when done for prolonged interrogatory purposes and without proven justification for such delay, renders involuntary and therefore inadmissible whatever confessional admissions that accused may have made while he was being unlawfully detained.

9. CRIMINAL LAW—ARREST—ARRAIGNMENT—UNNECESSARY DELAY—EXTRAJUDICIAL STATEMENTS—EXCLUSIONARY RULE.

Rule that an unnecessary and therefore unlawful delay between an accused's arrest and arraignment will render inadmissible any confessions he makes during his unlawful detention applies alike to his inculpatory and exculpatory confessions, admissions and statements.

10. CRIMINAL LAW—EVIDENCE—EXTRAJUDICIAL STATEMENTS—LAWFUL DELAY—ADMISSIBILITY.

Defendant's oral exculpatory statement was admissible where the evidence showed that he was interrogated the day following his arrest, that the delay was not for the unlawful purpose of

prolonged interrogation, that no duress was exerted against
him in any manner, that his statement was not involuntarily
extracted from him through physical or psychological tactics
of coercion, and that he did not at any time contend that he
was not informed of his constitutional rights before making
his statement.

11. CRIMINAL LAW—ATTORNEY AND CLIENT—CODEFENDANTS.
    Legal representation at trial of codefendants was not rendered
    less effective because they had the same attorney where the
    only source of any conflict of interest between the codefendants
    was the proper admission into evidence of one defendant's oral
    exculpatory statement against the declarant alone.

12. CRIMINAL LAW—EVIDENCE—EXTRAJUDICIAL STATEMENTS—ADMIS-
    SIBILITY—JURY INSTRUCTIONS.
    Admission of a defendant's oral exculpatory statement did not
    harm the declarant where the trial court not only had insisted
    that this defendant's exculpation theory be presented to the
    jury for its consideration but also had charged the jurors that
    if they were satisfied that the declarant was present at the
    crime scene but did not know that his companions had any plan
    or scheme to rob a grocery store, that they should acquit him
    if they had any doubt regarding his guilt.

13. CRIMINAL LAW—ATTORNEY AND CLIENT—TRIAL—STRATEGY—ACTS
    OF OMISSION.
    An attorney's acts of omission are trial strategy and do not
    constitute ineffective legal representation of his client.

14. CRIMINAL LAW—JUDGMENT—NOTWITHSTANDING THE VERDICT—
    EVIDENCE—SUFFICIENCY.
    A judgment notwithstanding the verdict should not be granted
    where sufficient evidence was presented which, if believed, en-
    abled a jury to find a verdict of guilty beyond a reasonable
    doubt.

Appeal from Recorder's Court of Detroit, Robert
E. De Mascio, J.  Submitted Division 1 May 9, 1969,
at Detroit.  (Docket Nos. 4,723, 6,088.)  Decided
October 1, 1969.  Rehearing granted as to defendant
Williams October 31, 1969.  Application for leave to
appeal filed October 20, 1969, by defendant Gardner.
Opinion on rehearing December 9, 1969.  Leave to
appeal denied February 5, 1970 as to defendant
Williams.  See 383 Mich 765.

Wavie R. Williams, Jr., and Johnnie Sylvester
Gardner were convicted by a jury of assault with
intent to rob and steal being armed and assault with
intent to commit murder. Defendants appeal. Af-
firmed.

*Frank J. Kelley*, Attorney General, *Robert A.
Derengoski*, Solicitor General, *William L. Cahalan*,
Prosecuting Attorney, *Dominick R. Carnovale*,
Chief, Appellate Department, and *Arthur N. Bishop*,
Assistant Prosecuting Attorney, for the people.

*Irving Tukel*, for defendant Wavie R. Williams,
Jr.

*Harold Koenigsberg* (*Justin C. Ravitz*, of coun-
sel), for defendant Johnnie Sylvester Gardner.

Before: HOLBROOK, P.J., and McGREGOR and BRON-
SON, JJ.

## OPINION ON REHEARING

HOLBROOK, P.J. Defendants Johnnie Sylvester
Gardner and Wavie R. Williams, Jr., were tried in
a joint trial and convicted by a jury in the recorder's
court for the city of Detroit, on June 16, 1967, of
the crime of assault with intent to rob and steal be-
ing armed (CL 1948, § 750.89 [Stat Ann 1962 Rev
§ 28.284]) and the crime of assault with intent to
commit murder (CL 1948, § 750.83 [Stat Ann 1962
Rev § 28.278]). Both defendants were represented
at the trial by the same retained counsel. Neither
defendant took the witness stand. Defendant Gard-
ner was sentenced to prison for a term of 11 to 20
years and defendant Williams for a term of 17 to
35 years. Evidence was presented by the prosecu-
tion showing that on the evening of November 11,

1966, three men entered the Y and B Market, armed
with pistols, and proceeded to demand money from
owner Albert Yezbick and his son, Victor Yezbick.
They departed after one of the men shot and
wounded Albert Yezbick. Victor Yezbick, using a
gun which was kept in the store, fired three shots
at the men as they fled onto Milwaukee street from
John R. street. A passerby, Thomas Phelan, armed
under a concealed weapon permit, testified to having
chased the three men on foot after they fled from
the store brandishing weapons, with Phelan firing
shots at them and at the get-away car located on
Milwaukee, around the corner from the Y and B
Market. Both described the get-away car as a blue
Oldsmobile convertible with white top.

Witness Phelan testified on direct examination in
part as follows:

"*Q.* Do you know if there was anyone in the car,
in the Oldsmobile, when they ran to it?
"*A.* Yes, there was.
"*Q.* When they got in there would be four persons
altogether?
"*A.* Yes.
"*Q.* Could you identify the person that was in the
car?
"*A.* No.
"*Q.* What did you do then when they got in the
car?
"*A.* I opened fire on the automobile.
"*Q.* How many shots in all did you fire?
"*A.* Six; one in the tire, one in the bumper, three
into the trunk and one in the back window."

A 1960 Oldsmobile meeting this description was
examined by a patrolman at a Detroit motel on
December 3, 1966. He testified that the car con-
tained numerous holes in the body, appearing to be
bullet holes, and in the convertible top, side and

rear view mirror. Defendant Gardner, taken into custody at that time, stated to the patrolman that the car in question was his. The car was subsequently determined to have been registered to a John S. Gardner.

Wiley Richardson, Jr., owner of a service station a block from the scene of the crime testified that he had identified defendant Gardner in a lineup sometime after November 11, 1966, "maybe about a week later, two weeks later, * * * I couldn't recall." The witness identified Gardner again, at the trial, as having entered his station on foot at approximately 6 o'clock on the night in question accompanied by two companions. Gardner asked to use the rest room, got the key and went to the outside rest room. The witness testified that after Gardner brought the key back the witness looked out the window and saw three men going toward the Y and B Market. He did not know whether Gardner was one of the three.

Defendant Gardner was not identified as having been in the Y and B Market at the time of the offense. Defendant Williams was identified by Victor Yezbick in a lineup and again at trial. Witness Yezbick testified as follows:

"*Q.* About 6:10 p.m., around that time, 6 o'clock p.m., did a number of men enter the store?

"*A.* Yes, three young men.

"*Q.* Were there customers in at the time they entered the store?

"*A.* Three customers.

* * *

"*Q.* All right. Fine. What happened when they entered the store?

"*A.* Well, they first went over to the meat counter, which is over to the far end of the store. I saw them when they come in. I usually observe everybody that does come into the store and I walked parallel

to them, to the side, and they asked my dad for hot dogs; got a pound of hot dogs. Usually I observe when strange people come in. I keep them under observation. And I knew they were up to something. I didn't know they were up to that. But when there are three of them coming in buying hot dogs, there is something wrong.

"Q. You were watching them?

"A. I was watching them, yes.

\* \* \*

"A. He said, 'This is a stickup. Nobody moves.' Nobody heard them or paid attention. Then he said it again, 'This is a stickup. Don't nobody move.' And I tried to get them away from my father, because he was retired and I know him. Because he won't give them nothing. I was trying to get them away from my father and he just finished with the customer, and he had a big bill and he handed it to me and one fellow says, 'I will take that, too.'

\* \* \*

"Q. Can you identify any of these men in the store?

"A. Yes.

"Q. Which one?

"A. Williams.

"Q. The one seated in the back?

"A. Yes.

\* \* \*

"*The Court:* \* \* \* The record will now stand that he identified Wavie Williams.

\* \* \*

"Q. Now, what did Wavie Williams in particular do? What was his part in this that you saw?

\* \* \*

"A. He come behind the cash register. The three of them spread out. One came behind the cash register. He came behind the cash register. This other fellow that is dead, he was in the middle.

\* \* \*

"*Q.* What happened when Williams went behind the counter?

"*A.* He said, 'Come on. Give me all your money. Let's go.'

\* \* \*

"*Q.* Was there one distinguishing factor that caused you to identify this person as the person being in your store that Friday on November 11?

"*A.* Himself. That I saw the face before.

\* \* \*

"*Q.* Is there any way that you could be mistaken about your identity of this individual?

"*A.* No. When he walked I observed his walk. When he walked in I observed the up and down walk, the strut. I observed that."

Sidney Freeman, a customer who was in the store when the three armed men entered, identified Williams as having been one of the three men. His testimony was in part as follows:

"*Q.* Are you familiar with the Y and B Market in the City of Detroit?

"*A.* Yes, sir.

"*Q.* Do you trade at the store?

"*A.* Yes, sir.

"*Q.* Did you have occasion to go there on a Friday of last year in November, November 11, 1966, in particular?

"*A.* I go there everyday.

\* \* \*

"*Q.* Did you happen to be there that Friday about 6 o'clock in the evening?

"*A.* I was there.

"*Q.* What did you see at that time, if anything?

"*A.* I see'd him get shot.

"*Mr. Connor:* Let the record show that he [is] pointing to and identifying Albert Yezbick.

\* \* \*

"*Q.* Did you see the man that did the shooting?

"*A.* Yes, sir.

"*Q.* Can you identify him?

"*A.* Yes.

\* \* \*

"*Q.* Look around the courtroom and see if you see him here.

"*A.* There he is.

"*Q.* Which man in particular are you indicating over there? Point again. I couldn't make out who you were pointing to.

"*A.* The man sitting behind that man there.

"*Q.* The man with the black shirt on?

"*A.* Yes.

"*Mr. Connor:* Let the record show that he is pointing to and identifying the defendant Wavie R. Williams.

"*Q.* He was one of the men in the store and he did the shooting?

"*A.* Yes.

"*Q.* Are you sure he did the shooting or he was just there?

"*A.* I am sure. I see'd it.

"*Q.* He had a gun?

"*A.* Sure, he had a gun."

Defendants appealed their convictions, each raising several assertions of error in the lower court proceedings. The following issues are raised by defendants on appeal.

1. *Was the admission into evidence of co-defendant's (Gardner's) oral exculpatory statement implicating defendant Williams violative of Williams' Sixth Amendment right of cross-examination where defendant Gardner did not testify?*

Defense counsel proceeded in the trial of this cause upon the theory that both defendants denied having taken any part in the holdup of the Y and B Market on November 11, 1966. The record is clear that on December 4, 1966, Detective Gilbert Hill had a conversation with defendant Gardner at the Holdup Bureau and that at that time defendant Gardner

made a statement which was subsequently admitted
at the trial. In the presence of the jury, Detective
Hill testified as to the substance of defendant Gard-
ner's statement:

"*Q.* As near as you can recall, what was your
conversation?

"*A.* He told me that he was driving—that, 'We
were driving down John R.' and they pulled over
at Milwaukee and John R, I believe it was, so that
he could go to the bathroom. He told me that he
went into the bathroom, came back to the car, and
when he came back to the car Wavie Williams, Herb-
ert Farmer and John Anthony said they were going
to the store to get some beer to check it out. He
told me that he was scared and that he said he asked
them what they were going to do, and they walked
on to the store. He stated that he remained in his
car. He walked back to the corner, got out of the
car once and walked back to the corner and looked
around the corner and he saw guns coming out and
heard all of this shooting. He stated at this time
that he got scared and ran and got into his car and
started it up and attempted to pull away from the
curb. I believe he stated that he had a little trouble
getting out. I don't know if because of the parked
cars or what.

"But by this time he heard all the shooting and
Wavie Williams came and got in the car and he
asked him, 'Man, what have you done?' and he
stated, 'Get out of here quick.' And Wavie Wil-
liams was followed in the car by John Anthony, and
at this time he almost pulled away but Herbert
Farmer jumped in and at the last minute, and he
stated that bullets were flying everywhere and one
flew by his head and one went by the right window
and either bullets or glass nicked Herbert Farmer
on the head and he stated that he drove home at this
time and told his wife that he was in serious trouble
or that the car was in serious trouble. I don't re-

member which. And he asked her to report it stolen, which she did.

"*Q.* Did he mention to you in particular what they went to the store for?

* * *

"*A.* He stated they were going to the store to get some beer and to check it out and if it was cool he thought they were going to take it off.

"*Q.* Did you ask him what he meant by check it out and if it was cool he thought they were going to take it off?

"*A.* I knew what that meant. And I asked him if they were going to hold the place up and he said, 'I don't know if they were going to hold the place up.' These are his words."

In charging the jury upon the law applicable to the case the trial court stated as follows:

"Now, as I say, you are the sole judges of the credibility of the witnesses sworn and of the weight to be given to their testimony. For example, in this particular case, there was evidence introduced by the people concerning a statement, an alleged statement by one of the defendants, namely Johnnie Sylvester Gardner. By statement, I mean it was an oral interview. It was testimony concerning an oral interview between Detective Hill and defendant Johnnie Sylvester Gardner. On that statement the weight and credibility is for you to determine. You are to decide how much weight you will give such a statement and you will determine how much credibility you will give that statement.

"For example, you may feel that you should believe all the statement, the truth of the statement. You may believe any portion of it, as you heard it from the witness Hill, as witness Hill related it. But I charge you here and now, as I admonished you previously, the statement was introduced by the people, and as I say, the weight to be attached to it and the credibility to be attached to it is for you to de-

cide. But under no circumstances are you to consider any portion of that statement as being binding upon the defendant Wavie R. Williams, because it is clear from the testimony that defendant Williams was not present. He cannot be held bound by it and you are not to consider it when you are considering the testimony as to Wavie R. Williams."

It would appear at first blush that in light of the United States Supreme Court's holding in *Bruton* v. *United States* (1968), 391 US 123 (88 S Ct 1620, 20 L Ed 2d 476), made retroactive in *Roberts* v. *Russell* (1968), 392 US 293 (88 S Ct 1921, 20 L Ed 2d 1100), we should reverse the conviction of co-defendant Williams, notwithstanding the limiting instruction given by the trial court. However, the effect of *Bruton, supra,* has been recently interpreted in the cases of *Chapman* v. *California* (1967), 386 US 18 (87 S Ct 824, 17 L Ed 2d 705) and *Harrington* v. *California* (1969), 395 US 250 (89 S Ct 1726, 23 L Ed 2d 284) and we deem it proper to consider the present case in the light of these decisions.

In *Harrington* v. *California, supra,* Mr. Justice Douglas, speaking for the Court, stated (pp 251, 252, 254):

"We held in *Chapman* v. *California* (1967), 386 US 18 (87 S Ct 824, 17 L Ed 2d 705, 24 ALR3d 1065), that 'before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt'. *Id.,* at 24. We said that, although 'there are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error' (*id.,* at 23), not all 'trial errors which violate the Constitution automatically call for reversal.' *Ibid.*

"The question whether the alleged error in the present case was 'harmless' under the rule of *Chapman* arose in a state trial for attempted robbery and

first-degree murder. Four men were tried together
—Harrington, a Caucasian, and Bosby, Rhone, and
Cooper, Negroes—over an objection by Harrington
that his trial should be severed. Each of his three
co-defendants confessed and their confessions were
introduced at the trial with limiting instructions
that the jury was to consider each confession only
against the confessor. Rhone took the stand and
Harrington's counsel cross-examined him. The
other two did not take the stand." * * *

"We do not depart from *Chapman;* nor do we
dilute it by inference. We reaffirm it. We do not
suggest that, if evidence bearing on all the ingre-
dients of the crime is tendered, the use of cumulative
evidence, though tainted, is harmless error. Our
decision is based on the evidence in this record. *The
case against Harrington was not woven from circum-
stantial evidence.* It is so overwhelming that unless
we say that no violation of *Bruton* can constitute
harmless error, we must leave this state conviction
undisturbed." (Emphasis supplied.)

We rule that the present case falls within the
holding of the *Harrington Case, supra,* and is con-
trolled thereby. The case against co-defendant Wil-
liams was not predicated upon circumstantial evi-
dence but, rather, upon the testimony of witnesses
who identified Williams as a participant in the
crimes charged. We conclude that the violation of
*Bruton, supra,* in this case was harmless error under
*Harrington, supra,* in that the overwhelming direct
evidence presented upon the trial not only placed
Williams at the scene of the crimes, but also identi-
fied him as the person who shot one of the proprie-
tors of the store. The testimony contained in the
statement of his co-defendant, Johnnie Sylvester
Gardner, was merely cumulative and harmless error.
The record shows that defendant Williams admitted
his guilt of the crimes charged and of other crimes
when before the court for sentencing.

Other claims of error by defendant Williams are without merit. We do take note of defendant Williams' claim of error where he now objects to the allowing of testimony of a witness for the prosecution pertaining to the death of the alleged co-felon and the conviction of another and that he was "getting 25 to 50 years." At no time was this testimony objected to by defense counsel. Such alleged errors will not be considered for the first time on appeal where no objection was made at the trial. *Rottman* v. *Township of Waterford* (1968), 13 Mich App 271, 274; *People* v. *Bark* (1930), 251 Mich 228; *People* v. *Wittersheim* (1930), 252 Mich 538.

2. *Did admission into evidence of defendant Gardner's oral statement made while in custody, following arrest, deny him effective assistance of counsel so as to require a reversal of his jury conviction?*

Defense counsel objected at trial to the admissibility of defendant Gardner's oral statement on the ·ground that no *corpus delicti* had been established linking Gardner to the crime. This objection was overruled by the trial court. On appeal, Gardner concedes that the statement was not inadmissible because of an absence of proof of *corpus delicti* but, ·argues that because of the length of time of defendant's confinement, the statement was inadmissible upon due process grounds, citing *People* v. *Hamilton* (1960), 359 Mich 410; *People* v. *McCager* (1962), 367 Mich 116; and *People* v. *Ubbes* (1965), 374 Mich 571.

In *Hamilton, supra,* p 417, the Supreme Court held that:

"An unnecessary and so unlawful delay [between arrest and arraignment] * * * when done for prolonged interrogatory purposes and without proven justification of the delay, renders involuntary and so inadmissible whatever confessional

admissions the detained person may have made while so unlawfully detained."

The Court determined that defendant Hamilton's confession, obtained during periodic interrogation over a continuous four-day period following arrest, with no effort having been made in the interim to take defendant before a magistrate, deprived him of his constitutional guarantee of due process. The purpose of the detention was determined to be that of obtaining from Hamilton a confessional statement of his guilt. An attorney who sought to see Hamilton professionally was denied access to him on several occasions during the period of detention, while Hamilton was sent to various officers on different floors of the headquarters building. The *Hamilton* exclusionary rule, in cases where its application is justified, applies alike to inculpatory and exculpatory confessions, admissions and statements of an accused. *People* v. *Besonen* (1966), 4 Mich App 131, 138.

In *People* v. *Ubbes, supra,* the contention asserted by defendant was considered (p 576):

"(1) Defendant's detention and confinement in jail from 6 p.m., October 26th to 10:35 a.m., October 27th, at which time he made a statement admitting his guilt of theft, did not, under the circumstances here shown, render the statement, *i.e.,* confession, inadmissible as a matter of law, as being obtained during illegal custody for failure to take him before a magistrate within that period.

"The lapse of 16-1/2 hours *per se* is not conclusive. Time of detention alone, without arraignment, is not the test. If for the same 16-1/2 hours defendant had been held without appearance before a magistrate and he had been 'sweated,' *i.e.,* questioned unremittingly for the purpose of extracting a confession, we would not hesitate to strike down the practice and withhold from jury consideration

his alleged confession. Here the totality of circumstance indicates bona fide questioning to determine the immediate issue of release, or complaint, and complaint for what offense. We believe this is the meaning of the rule announced in *People* v. *Hamilton* (1960), 359 Mich 410."

The evidence in the instant case indicates that defendant Gardner's statement was not involuntarily extracted through physical or psychological tactics of coercion or otherwise. Gardner does not contend that he was denied his *"Miranda"* warnings before making the statement in question. *Miranda* v. *Arizona* (1966), 384 US 436 (86 S Ct 1602, 16 L Ed 2d 694, 10 ALR3d 974). This Court is restricted to reviewing the record before it. *Shulhan* v. *Hamtramck City Council* (1966), 5 Mich App 399. On the basis of this record which reveals *inter alia* that defendant was arrested on December 3, 1966, and questioned on December 4, 1966, that the delay was not for the unlawful purpose of prolonged interrogation and no duress being exerted against defendant in any manner, we conclude that there was no violation of due process of law so as to render Gardner's oral statement inadmissible in evidence.

It is defendant's contention that irrespective of the admissibility of his oral statement there were inconsistent defenses which rendered defendant Gardner's representation upon trial less effective than it might have been if a separate attorney had represented him. The sole source of any conflict of interest between the two defendants was the proper admission of defendant Gardner's oral exculpatory statement into evidence against the declarant. As for particular harm incurred by defendant Gardner through the admission of his own statement, however, none is shown save for the

inquiring of counsel: "Can anyone impartially say that appellant Gardner's case was not prejudiced by the conflict, that counsel might have rendered more effective representation absent the divided loyalties?" Counsel for defendant Gardner concedes, as he must, that the trial judge did insist that the theory of defendant Gardner be presented to the jury for its consideration. In this regard the court stated in its charge:

"If * * * you are satisfied that he was present there at the scene but did not have knowledge, that he did not know there was any plan or scheme to go in and rob the store, then he would not be guilty.

"If by virtue of the fact that he indicated through witnesses here that he had no knowledge and you believe that statement, and that is sufficient to raise a doubt in your mind as to his guilt, you would be obliged to acquit him of this offense."

The several cases cited by defendant Gardner for the proposition that convictions should be overturned where ineffectiveness of counsel is caused by a conflict of interest situation between attorney and client are inapposite and not controlling in the instant case. *Glasser* v. *United States* (1942), 315 US 60 (62 S Ct 457, 86 L Ed 680); *Craig* v. *United States* (CA 6, 1954), 217 F2d 355; and *Glenmore* v. *United States* (1965), 122 App DC 143 (352 F2d 359). In *Glasser,* unlike the instant case, the trial court imposed representation of Glasser's co-defendant upon one of Glasser's two retained attorneys, while aware of a possibility of conflict in the defenses of the co-defendants. In neither *Craig* nor *Glenmore* was a defendant's own exculpatory statement involved, nor invoked, as the claimed basis for prejudicial inconsistency in the defenses asserted. Craig and Glenmore were, in effect, implicated in the offenses charged by reason of the

testimony of other witnesses. On this basis, rather than on the basis of their own exculpatory statements, were the defendants deemed to have been deprived of effective assistance of counsel. In *Glenmore, supra,* the Court, referring to the case against defendant-declarant Campbell, stated:

"The record as to Campbell presents a different situation and we are unable to perceive anything indicating that his defense suffered from sharing an attorney with Glenmore. We find no basis for disturbing the judgment of conviction as to him."

Likewise, in the instant case, we are unable to find any validity for the contention of defense counsel that defendant Gardner was denied effective assistance of counsel because of the admission of his own exculpatory statement.

Defendant further contends that he was denied effective representation of counsel during the trial proceedings for reasons which may be classified as acts of omission on the part of counsel constituting trial strategy. We have considered the contentions made by defendant and find them to be without merit. 74 ALR2d, p 1399. Appellate courts never try to second-guess trial counsel on matters of strategy. *People v. Martin* (1920), 210 Mich 139; *People v. Foster* (1920), 211 Mich 486; *People v. Crosby* (1969), 19 Mich App 135.

Defendant Gardner claims on appeal that the trial court committed error in charging the jury on the law relevant to his case. No objections to the court's instructions were made by this defendant in the trial court. There is no merit in this assertion of error. GCR 1963, 516.2, is controlling.

Finally, defendant Gardner would have this Court conclude that the proofs were consistent with his innocence and that a judgment notwithstanding the

verdict should be granted. The question of this defendant's guilt or innocence was one of fact for jury determination, under proper instructions. There was sufficient untainted evidence presented in the instant case, if believed, for the jury to find a verdict of guilty beyond a reasonable doubt.

Affirmed.

All concurred.